**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | | |
|---|---|---|
| **RYAN M. SAPP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. Civil No. 3:13-CV-0512** |
| | ) | **Judge Trauger** |
| **WESTERN EXPRESS** | ) | **Magistrate Judge Knowles** |
| | ) | **JURY DEMAND** |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES now Plaintiff, Ryan Sapp, by and through counsel, to respond in opposition to

Defendant' Motion for Summary Judgment, in accordance to Rule 56 of the Federal Rules of

Civil Procedure.

## I.  STATEMENT OF FACTS

### A.  Plaintiff's Career with Defendant

In July 2010, Plaintiff, Ryan Sapp ("Plaintiff"), was hired by Defendant, Western

Express, Inc. ("Defendant"), a trucking-service company, in July 2010.  (Deposition of Clarence

Easterday ("Easterday Dep") 27:23-25, referenced as Exhibit 1 in the contemporaneously filed

Notice of Filing).  He worked night shift, and tracked freight.  (Pltf Dep 23:02-03; 32:02-05).

Night-shift also answered phone calls, responded to messages, and handled a variety of issues

such as accident reports.  (Easterday Dep 32:18-25; 33:02-03; 33:07-10).  Plaintiff would fill in

for absent employees.  (Deposition of Ryan Sapp ("Pltf Dep") 35:01-03, referenced as Exhibit 2

in the contemporaneously filed Notice of Filing).  When Jack Knuutila ("J. Knuutila"), night-

1

shift Supervisor, called him once in Knoxville; Plaintiff drove three hours back to cover for someone.  (*Id.* at 35:10-16).

Neither Geoff Grenier ("Grenier"), Plaintiff's soon-to-be day-shift Supervisor and Senior Vice President of Operations (Pltf Dep 38:20-22), nor Clarence Easterday ("Easterday"), who was Executive Vice President and also responsible for various HR-like functions (Easterday Dep 21:06-14), remembers any problems concerning Plaintiff's performance on night shift. (Deposition of Geoff Grenier ("Grenier Dep") 19:02-05, referenced as Exhibit 3 in the contemporaneously filed Notice of Filing).  (*Id.* at 36:06-09).

In 2011, Plaintiff was looking to "do more," and requested a change to day shift. Defendant responded positively to his request, and placed him in a day-shift extended-coverage position.  (Wallace Dep 17:25-18:09).   Matthew Wallace ("Wallace"), Director of Fleet Management (*Id.* at 16:19-24) and Alex Trent ("Trent"), Terminal Manager, made the decision to transfer him.  (Grenier Dep 19:14-15; 22).   Prior to the transfer, Wallace spoke briefly with J. Knuutila, who had no issues with Plaintiff.  (Deposition of Matthew Wallace ("Wallace Dep") 18:10-16, referenced as Exhibit 4 in the contemporaneously filed Notice of Filing).  The transfer was considered a promotion—a reflection that Plaintiff was competent and did a good job at nights.  (Grenier Dep 19:12-16).   Plaintiff would not have been allowed to come to days if he was a poor performer at night.  (*Id.* at 38:01-03).

On day shift, his direct supervisor was Trent (Wallace Dep 18:17-24); he also reported to both Grenier and Wallace.  (Pltf Dep 39:01-05).  Day-shift duties differ from nights in that they manage the drivers, as well as customer interactions.  (Easterday Dep 35:11-15).  They also track expedited customers, check the status of trucks in the shop, and track trailers.  (Grenier Dep 20:08-17).  Since day and night shifts were so different, it was not uncommon that individuals

who went from nights to days were not able to handle the faster pace and larger staff, and they would go back to nights. Defendant didn't end their career if they didn't make it at days; they sent the employees back to nights. (*Id.* at 37:03-09).

Plaintiff had job-performance conversations with Wallace, who told him he was doing fine. (Pltf Dep 56:10-13). Wallace never complained to him about his job performance. (*Id.* at 56:25-57:04). Although Wallace testified he was unaware Plaintiff sought treatment at Cumberland Heights—that no one at Defendant ever informed him of that—it was he who held Plaintiff's job open when Plaintiff requested to go to rehabilitation for alcohol problems. (Wallace Dep 37:06-12; Pltf Dep 31:01-04). Wallace told Plaintiff he could leave of his own accord, come back, and the job would be waiting for him. (Pltf Dep 31:10-12; 34:11-15). Easterday confirmed this when he testified in deposition that, after rehabilitation, Plaintiff was eligible for rehire, and did come back and resume his role on the night shift. (Easterday Dep 79:02-25). After 22-23 days of treatment, Plaintiff went right back into his position on night shift. (Pltf Dep 34:20-21). Plaintiff continued to earn his salary of $36,000.00 until he was terminated on July 17, 2012. (*Id.* at 22:20-25; 59:21-60:02).

**B. Plaintiff's Disability**

Plaintiff suffers from a disability: anxiety/panic disorder. He deals with anxiety every day. Some days it is moderate; however, there have been days with such severe symptoms he thought he was having a heart attack. (*Id.* at 47:01-06). There is a correlation between stress and his disorder. (*Id.* at 48:20-21). To manage his disability, he takes Clonazepam or Klonopin for the anxiety. (*Id.* at 08:05-08). These medications are prescribed by his family practitioner, Dr. James Botsko. (*Id.* at 08:13-14; 46:18-19). He also sees Dr. Annita D'Amico, a psychiatrist. (*Id.* at 08:18-23). Plaintiff has struggled with his disorder for a long time. He testified in

3

deposition that he can't just "flip it off like a light switch."  (*Id.* at 93:09-15).  His disorder was *absolutely the worst* when he worked for Defendant.  (*Id.* at 47:01-06).

### C.  Defendant's Knowledge of Plaintiff's Disability

Defendant knew about Plaintiff's panic disorder even before he was officially hired. Prior to the mandatory drug test for employment, he informed Owner, Wayne Wise ("Wise"), Corporate Representative, Mike Erskine ("Erskine"), and Daniel Knuutila ("D. Knuutila"), the Driver Manager and Plaintiff's Supervisor when first hired, about his disorder.  Plaintiff wanted them to be aware, because he might fail the drug test due to his prescription medications, which are controlled substances.  From the beginning, Plaintiff was honest with Defendant.  He gave them "fair warning" he had been treated for anxiety disorder for several years.  (*Id.* at 50:14-25). The drug-test results did, in fact, indicate his medications, but because they were prescribed, he passed.  (*Id.* at 51:09-11).

J. Knuutila, the night shift Supervisor, was another member of management who knew of Plaintiff's disorder.  One night, J. Knuutila asked him what was "going on."  He detailed his panic disorder and stated it was just something Plaintiff "had to deal with."  (*Id.* at 51:16-22). Grenier also knew he had a panic disorder.  Plaintiff specifically told him about his panic attacks. (*Id.* at 94:11-13).  Grenier asked several times, "Why are you freaking out?  Calm down.  Why are you so wound up?"  Plaintiff told him, "I have anxiety.  I'm trying to calm down and do my job."  (*Id.* at 93:09-15).  Once, a few weeks before Plaintiff was terminated, Grenier told him to "calm down and chill out" and Plaintiff explained he can't just "turn it off."  (*Id.* at 94:14-24).

### D.  Grenier, the Primary Catalyst for Plaintiff's Stress

When Plaintiff wasn't around Grenier, he was able to do his job despite the panic attacks. (*Id.* at 51:23-25). Other than Grenier's meeting Plaintiff when Grenier was first hired by Defendant, there was no reason for Grenier to have any interaction concerning Plaintiff's employment on night shift. Grenier had no direct knowledge of Plaintiff's job performance at all. (Grenier Dep 18:12-19).

Grenier made Plaintiff's disorder worse. (Pltf Dep 52:01-04). Although Grenier testified he "left it to his managers to evaluate people's individual performance" (Grenier Dep 21:17-22), on multiple occasions, he berated Plaintiff and screamed in his face. (Pltf Dep 36:19-22). He took Plaintiff in his office numerous times and screamed at him. No one other than Grenier screamed at Plaintiff. (*Id.* at 38:02-08). Although Grenier does not remember ever using obscenities when talking to Plaintiff—and even went so far as to testify that he never hollered or screamed at Plaintiff—there were witnesses. (Grenier Dep 33:20-25). Trent and Wallace once witnessed him using obscenities at Plaintiff. (Pltf Dep 36:24-37:02). Grenier said he used to be a pro-football player (Grenier Dep 11:12-17) who "thought he was good, but f---ing sucked." Grenier told Plaintiff that "he f---ng sucked, too, and what the f--- was Plaintiff doing?" (Pltf Dep. 37:04-06). As a result of that tirade, Plaintiff had a panic attack. Plaintiff didn't argue or offer a defense—instead, he removed himself from the situation. (*Id.* at 49:17-20). When he walked outside to get away from Grenier, Trent followed him and said, "That's just the way Grenier is," and Plaintiff would just "have to get used to it." (*Id.* at 37:09-13). Trent seemed understanding, and advised him to do whatever he needed to try to calm down. (*Id.* at 50:04-05).

Since Plaintiff was the only one that worked on weekends, he was essentially charged with everything. Once, Grenier called and said he was coming in because of a problem. When he arrived, with his young child in his car—he proceeded to scream at Plaintiff while driving him

5

to the repair shop. (*Id.* at 40:01-10). Grenier would always find a reason to yell; took his frustrations out on Plaintiff. (*Id.* at 42:02-06). Grenier screamed, but never went into detail about Plaintiff's performance. He just said broadly, "You suck at your job." (*Id.* at 55:13-15). This happened from Plaintiff's Day One on day shift, until Plaintiff requested transfer back to nights. (*Id.* at 56:04-05; 08-09). Grenier's yelling was for no reason. (*Id.* at 42:13-15). Although Wallace "could not say" whether Grenier ever raised his voice to Plaintiff, when Plaintiff had conversations with Wallace about job performance, Wallace told him he was doing fine, and to "keep his head down" and ignore Grenier. (Wallace Dep 26:25-27:02; Pltf Dep 56:10-13).

Grenier treated Plaintiff differently, making him do things no one else had to do. He was singled out. (Pltf Dep 42:02-06; 83:07-10). For instance, once—in 105-degree heat—Grenier sent him to talk to a driver about equipment. (*Id.* at 81:18-82:02). Plaintiff was the only one required to be outside in the heat; everyone else was allowed to work at their desks. (*Id.* at 82:06-10). He was singled out to work in the shop and go outside to perform random activities; while the others remained inside doing their respective jobs. (*Id.* at 82:24-83:03). Conversely, his other supervisors, like Wallace and Trent, were always respectful to him. (*Id.* at 39:15-18). J. Knuutila and D. Knuutila didn't treat him any differently because he had panic attacks. (*Id.* at 95:10-15). No one else treated him differently because he had panic attacks. (*Id.* at 94:02-04).

In July, Plaintiff talked to Robert Stachura ("Stachura"), Chief Operating Officer with Defendant, concerning the issues. (Easterday Dep 44:17-19; Pltf Dep 84:03-05). He asked Stachura whom he should talk with about the situation with Grenier, and Stachura said to talk to Easterday and the other gentleman that was there. Stachura also stated he would talk with them

and get back to Plaintiff. They would figure out what they could do to help. (Pltf Dep 84:07-15). Plaintiff had no other conversations with him. (*Id.* at 84:19-24).

### E. Plaintiff's Request for Accommodations and Subsequent Termination

Finally, Plaintiff could take it no longer. Grenier asked him questions like, "Why are you so nervous all the time? What's the big deal? Why are you anxious?" He belittled Plaintiff and made him feel he had something seriously wrong. (*Id.* at 93:21-23). That's when Plaintiff went to Wallace and said, "I can't do this anymore. I need to go back [to the night shift]." (*Id.* at 56:15-24). He basically said he didn't want to work for Grenier. (Wallace Dep 31:10-13). Easterday, however, testified that Wallace did not report to him any problems with Grenier as the supervisor. (Easterday Dep 54:08-10). Grenier testified he was told Plaintiff said something to the effect he "didn't feel like he was treated fairly." (Grenier Dep 29:18-25). Plaintiff requested to transfer back to nights. (*Id.* at 30:06-08). Grenier recommended to Wallace that if Plaintiff wanted to go back to nights, let him do it, because Plaintiff was good at nights. (*Id.* at 31:13-15). Although Grenier was not at all involved with orchestrating that transfer, he was made aware of it by Wallace, and agreed to—or "green-lighted"—it. Grenier admits Plaintiff seemed to perform better at night. (*Id.* at 30:09-13).

On July 13th, Plaintiff told Wallace he needed to be transferred back to night shift, to work under J. Knuutila and D. Knuutila. Wallace told him that would be no problem; he would set it up. Wallace called J. Knuutila and told him Plaintiff was going to show up [on night shift]. J. Knuutila called Plaintiff and verified the transfer. He knew Plaintiff was going to be there at night, as did D. Knuutila and Wallace. Everybody on night shift knew he was going to be there. (Pltf Dep 58:16-20). Plaintiff confirmed he would be there; he was ready and excited to come back to night shift. On the day he was to switch to nights, he was accused of being tardy because

7

he didn't show up for day shift. Obviously, a miscommunication had occurred in Administration, because he was not supposed to be there in the day; he was supposed to be there that night. When he received a phone call from either Wallace or Grenier, he reminded them he was starting the night shift that night, and that J. Knuutila had already talked to him about it. (*Id.* at 52:13-53:08). Plaintiff thought he was to work on the night shift, that day. (Easterday Dep 62:15-17). Although Easterday claims Plaintiff knew he had to at least train his replacement, Easterday didn't know whether Wallace reiterated that to Plaintiff. (*Id.* at 63:16-22; 63:25-64:04). Even Wallace testified that Plaintiff said he misunderstood what they were doing. (Wallace Dep 35:10-13). Once Plaintiff grasped the situation, he reported to day shift. (*Id.* at 35:04-06). He received no subsequent disciplinary action or write-up from Wallace for showing up late that morning. (*Id.* at 24:09-12). When asked about any write-ups Plaintiff may have received, Wallace testified that he has not been able to find those. (Wallace Dep 20:25-21:01; Wallace Dep 21:04-06). Furthermore, Wallace made no recommendation that he be terminated, and was not communicating with anyone at Defendant that Plaintiff's employment was not working out and he needed to be transferred or terminated. (*Id.* at 34:01-07).

Plaintiff subsequently met with Easterday. (Pltf Dep 85:03-06). Easterday was actually meeting with him to determine what they could do. Easterday had not intended to terminate him, or would have had a witness in the room. (Easterday Dep 49:14-20). Wallace testified he did not tell Easterday that Plaintiff was a problematic employee and should be terminated. (Wallace Dep 35:23-36:01). Before Plaintiff could start explaining the situation to Easterday, however, Easterday terminated him. (Pltf Dep 86:06-09). Easterday said, "We're done. I'm going to terminate you right now." (Easterday Dep 55:20-21). Plaintiff did not become aggressive or

argumentative. (Pltf Dep 100:21-25). At the very moment Plaintiff was being fired, Grenier walked by the room, smiled at him, and gave a thumbs up. (*Id.* at 87:25-88: 03).

Plaintiff didn't really have problems at Defendant, other than with Grenier, who perpetuated the issue. (*Id.* at 87:13-19). Plaintiff has since gone into brokerage at Pearce Worldwide Logistics. (*Id.* at 26:24-27:04). He has had no problems in his new position there. He testified that it's been great; it's been the best job he has ever had. (*Id.* at 87:03-06).

### STANDARD OF REVIEW

Defendant as moving party has the initial burden of showing the Court, by reference to the record, the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the non-moving party has the burden of proof at trial, the movant must carry the initial burden in one of two ways: by either negating an essential element of the non-movant's case or showing that there is no evidence to support a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 606-08 (11th Cir. 1991). Bold, conclusory statements that the Plaintiffs cannot meet their burden at trial are insufficient. Only after the movants have met their initial burden does the burden shift to the non-moving party to "demonstrate that there is indeed a material issue of fact that precludes summary judgment." 929 F. 2d at 608.

**S**ummary judgment is inappropriate unless the evidence is so one-sided that a reasonable jury could arrive at only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." *Id.* at 255. Under F.R.C.P. 56, the Court's role is narrowly limited to assessing the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *Id.* at 249. "Summary judgment procedure is not a substitute for trial." *Stone v. Hinds,* 541 S.W. 2d 598,599 (Tenn. Ct. App.

1976).  Where disputed material facts exist, they are to be resolved by a trial on the merits.  *Id.*

As the Court evaluates the evidence, it must do so in the light most favorable to the nonmoving

party, and draw all reasonable inferences in the Plaintiff's favor.  *Stovall v. Clarke,* 113 S.W.3d

715, 721 (Tenn. 2003).

Reasonable inferences are inferences reasonably drawn from all facts then before the

Court.  Reasonable inferences are not necessarily more probable or likely than other inferences

that might tilt in the moving party's favor.  Instead, so long as more than one reasonable

inference can be drawn, and that inference creates a genuine issue of material fact, the trier of

fact is entitled to decide which inference to believe and summary judgment is not

appropriate.  *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## II. ISSUES OF LAW

### A.  Plaintiff Has Provided Sufficient Evidence Of Disability Discrimination To Deny Summary Judgment On His ADA And THRA Claim.

Plaintiff may establish a prima facie case of discrimination through either direct or

indirect evidence.  In the case at bar, Plaintiff does both.

Direct evidence includes "evidence that the employer relied upon the plaintiff's disability

in making its employment decision."  *Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173

(6th Cir. 1996) at 1185-86.  Likewise, claims for failure to accommodate are analyzed under the

direct-evidence framework.  To prove a claim of discrimination under the ADA using **direct**

**evidence**, a plaintiff must show that he:  (1) is disabled; (2) is otherwise qualified to perform the

requirements of his position despite his disability (a) without accommodation, (b) with an

essential job requirement eliminated, or (c) with a proposed reasonable accommodation; and (3)

the employer bears the burden of proving the a challenged job criterion is essential and a

business necessity or that a proposed accommodation will impose an undue hardship.  *Monette,*

10

90 F.3d at 1186. Direct evidence is sufficient to defeat a motion for summary judgment in employment discrimination cases. *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 511(2002). Again, an employer's **discriminatory statements** may be direct evidence of discrimination or form the basis for an inference of discrimination and establish pretext. *Ash v. Tyson,* 546 U.S. 454, 126 S.Ct. 1195 (2006

Plaintiff may establish a *prima facie* case of discrimination through **indirect evidence** by showing: 1) he is disabled; 2) he is otherwise qualified for the position, with or without reasonable accommodation; 3) he suffered an adverse employment action; 4) the employer knew or had reason to know of his disability; and 5) Plaintiff was replaced. *Macy v. Hopkins Cnty. Sch. Bd. of Educ.,* 484 F.3d 357, 365 (6th Cir. 2007).

**1.      Plaintiff Meets The Definition Of Disabled For Both Direct And Indirect Standards.**

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation**,** job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "disability" means (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1)(A)-(C). An individual may establish a disability under any one or more of these prongs. 29 CFR 1630.2(g)(2). Although Plaintiff only needs to establish a disability under one of the above-mentioned prongs, if the Court takes the evidence in the light most favorable to the Plaintiff in the case at bar, Plaintiff meets the definition of being disabled in all three ways. First, he had a mental disability that substantially limited one or more major life functions.

11

Second, there was a record of his disability; third, Defendant "regarded" Plaintiff as having a disability.

a.    **Plaintiff suffers from a physical or mental impairment that substantially limits one or more of his major life activities pursuant to 42 U.S.C. § 12102(1)(A)-(C).**

The record shows that Plaintiff suffers from a mental impairment:  anxiety/panic disorder.  (Pltf Dep 47:01-02).  Plaintiff testified that he takes Clonazepam or Klonopin for the anxiety, and he also takes Clonidine, for high blood pressure.  (*Id.* at 08:05-08).  These are prescribed by his family practitioner.  (*Id.* at 08:13-14; 46:18-19).  Plaintiff testified that on some days the anxiety is moderate, but on other days, it has been extreme.  (*Id.* at 47:02-06).  His disorder was *absolutely the worst* when he worked for Defendant.  (*Id.* at 47:01-06).

Defendant argues that Plaintiff offers no probative evidence of a disability under the ADA, and/or his major life activities were not substantially limited.  **42 U.S.C. § 12102 ("**The Code") explains that an impairment is a disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. The Code advises that the comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population *usually will not require scientific, medical, or statistical analysis*.

The Court should note that, during discovery, Defendant requested no medical records from Plaintiff, even though in his Responses to Defendant's First Set of Interrogatories, Plaintiff presented the names of medical providers from whom he has received treatment for his panic/anxiety disorder, and the specific form of treatment, including therapy and medications for each provider.  (Pltf's Resp to Def's Interrogatory No. 6, referenced as Exhibit 5 in the contemporaneously filed Notice of Filing).  Yet now, in an attempt to sand-bag Plaintiff,

12

Defendant argues, in its Motion for Summary Judgment, that Plaintiff presented no facts despite the responses mentioned above.

Second, Defendant has misinterpreted the meaning of "substantially limits" and the meaning of "major life function." To determine the meaning of those terms, we look to the Code for guidance. The Code provides a list of major life activities that includes ***concentrating, thinking, communicating, interacting with others***, and working; and the operation of a major bodily function, including … ***neurological***, ***brain***…functions. The Code also specifies that the term "substantially limits" shall be construed broadly…and is not meant to be a demanding standard. 42 U.S. Code § 12102

When determining whether a life activity is major, the term "major" ***shall not be interpreted strictly*** to create a demanding standard for disability. (ADAAA section 2(b)(4)). Whether an activity is a "major life activity" is not determined by reference to whether it is of "central importance to daily life." Defendant attempts to argue that panic disorder only "moderately" or "intermittently" prevented Plaintiff from performing one of the above activities, but Plaintiff, on the other hand, presents evidence that the disorder affected much more than work: it is something he deals with ***every day***. (Pltf Dep 47:01-02). While the symptoms are moderate on some days, there have been days when the symptoms were so severe he thought he was "having a heart attack." (*Id.* at 47:02-06). He testified in deposition that he can't just "flip off" his disorder "like a light switch." (*Id.* at 93:09-15).

Defendant also argues that Plaintiff's "major" life activity is "working," and that he is not disabled because he was able to work with his alleged disability. Even if Plaintiff's major life activity was "working," Plaintiff testified that his anxiety, if unaccommodated, did interfere with his working. He testified that a correlation existed between stress and his disorder. (*Id.* at 48:20-

21). Indeed, night shift may have been less stressful for many employees, as even Grenier acknowledged that day and night shifts were very different, and it was not uncommon that individuals who went from nights to days were not able to handle the faster pace and larger staff, and would go back to nights. (Grenier Dep 37:03-09). Grenier even recommended to Wallace that if Plaintiff wanted to go back to nights, "let him do it," because Plaintiff was good at nights. (*Id.* at 31:13-15). Furthermore, while on day shift, Plaintiff reported to Grenier, who made Plaintiff's disorder worse. (Pltf Dep 52:01-04). His disorder was *absolutely the worst* when he **worked** for Defendant. (*Id.* at 47:01-06). Thus, Plaintiff's disorder, which became aggravated by stress, substantially affected his work, as it did all activities in his life.

**b.      A record of Plaintiff's disability exists pursuant to 42 U.S.C. § 12102(1)(A)-(C)**

Defendant argues that Plaintiff provides no medical evidence or testimony from any medical provider as to Plaintiff's disability. On the contrary, Plaintiff takes Clonazepam or Klonopin for the anxiety. These medications are prescribed by his family practitioner, Dr. James Botsko. (*Id.* at 08:13-14; 46:18-19). He also sees Dr. Annita D'Amico, a psychiatrist. (*Id.* at 08:18-23). The medications, which are controlled substances, would have been detected on Plaintiff's drug screening upon his hiring. (*Id.* at 50:19-25). Defendant should have record of the drug test in Plaintiff's personnel file, but Defendant denies having a personnel file for Plaintiff. Furthermore, Plaintiff he presented the names of medical providers from whom he has received treatment for his panic/anxiety disorder, and the specific form of treatment, including therapy and medications for each provider. Again, Defendant has made no effort to obtain any medical records whatsoever. (Pltf's Resp to Def's Interrogatory No. 4 and 6, November 26, 2013).

Defendant knew about Plaintiff's panic disorder even before he was officially hired.

14

Prior to the mandatory drug test for employment, he informed Wayne Wise, Owner, and the Corporate Representative, Mike Ershkin, as well as Daniel Knuutila, his supervisor when first hired, about his disorder. He wanted them to be aware, because he might fail the drug test due to his prescription medications, which are controlled substances. (*Id.* at 50:14-21). From the beginning, Plaintiff was honest with Defendant. He gave them "fair warning" he had been treated for anxiety disorder for several years. (*Id.* at 50:21-25). The drug-test results did, in fact, indicate his medications, but because they were prescribed, he passed. (*Id.* at 51:09-11). Other of Plaintiff's Supervisors knew as well: Grenier, Plaintiff's day shift Supervisor, knew. (*Id.* at 93:09-15; 94:11-13). Plaintiff specifically told Grenier that he had panic attacks. (*Id.* at 94:11-13). Trent was also aware. (Pltf. Dep.. at 37:09-13; 50:04-05).

**c.** **Plaintiff was "Regarded As" having a disability pursuant to 42 U.S.C. § 12102(1)(A)-(C).**

Even if Plaintiff does not have a disability, he was "regarded as" having one. In amending the ADA, Congress stated: "If an individual establishes that he or she was subjected to an action prohibited by the ADA because of actual or *perceived impairment* (emphasis added) -- whether the person actually has the impairment or whether the impairment constitutes a disability -- then the individual will qualify for protection under the Act." 154 Cong. Rec. at S8842. *See also* 29 C.F.R. §1630.2(j)(1)(iii).

The standard for "regarded as," per current ADAAA statutory authority and case law, requires evidence that the employer took action based on impairment, "whether or not the impairment limits or is perceived to limit a major life activity," without regard to mistake, and without regard as to whether the employer thought it "substantially limiting." 42 U.S.C. §12102(3)(A); 29 C.F.R. §§ 1630.2(g)(1)(iii), 1630.2(1)(1), 29 C.F.R§1630.2(j)(2*); Saley v. Caney Fork, LLC*, 886 F Supp. 2d 837, 849-852 (M.D. Tenn. 2012); *Milholland v. Sumner*

*County Board of Education*, 569 F.3d 562, 566 (6th Cir. 2009). In *Ash v. Tyson,* 546 U.S. 454, 126 S.Ct. 1195 (2006), the Court held that a manager's use of the word "boy" when referring to African Americans was evidence of discriminatory animus in the selection process. *Id.* at 1197. In *Ross v. Campbell Soup, Co.*, 237 F.3d 701 (6th Cir. 2001), the Court held that statements made were sufficient to establish a genuine issue of pretext in a "regarded-as" disability case. Grenier constantly harassed Plaintiff about his anxiety. He commented that Plaintiff was "jittery" and "off his game," and asked questions like, "Why are you so nervous all the time? Why are you anxious?" (Pltf Dep 56:16-22) "Why are you so nervous? Why are you freaking out? Calm down. Why are you so wound up? What's the big deal?" (Pltf Dep 56:18-22; 93:09-11, 21-23). Per *Ash v. Tyson* and *Ross v. Campbell Soup*, these statements are discriminatory and sufficient enough to establish a genuine issue of pretext in a regarded as case.

2.  **Pursuant to Both Direct And Indirect Standards, Plaintiff Is Otherwise Qualified To Perform The Requirements Of His Position Despite His Disability, (A) Without Accommodation, (B) With An Essential Job Requirement Eliminated, Or (C) With A Proposed Reasonable Accommodation.**

   The term "'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). It is undisputed that Plaintiff represented that he was able to perform his job. (Def. Statement of Undisputed Facts, No. 14). His transfer from night shift to day shift was considered a promotion—a reflection that he was competent and did a good job at nights. (Grenier Dep 19:12-16). Plaintiff would not have been allowed to come to days if he was a poor performer at night. (*Id.* at 38:01-03). Plaintiff was not considered a problematic employee by Wallace. (Wallace Dep 35:23-36:01). Easterday was not aware of any issues regarding Plaintiff's employment. (Easterday Dep 36:06-09).

16

3. **Pursuant To The Direct Standard, Defendant Cannot Prove That The Proposed Accommodation Will Impose An Undue Hardship Per *Monette*, 90 F.3d at 1186.**

The ADA requires the employee and employer to interact in good faith to determine the "precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."   29 C. F. R. § 1630.2(o)(3); *Lafata v. Church of Christ Home for the Aged,* 325 F. App'x 416, 422 (6th Cir. 2009).  Failure to engage in the interactive process can result in liability under the ADA if reasonable accommodations would have been possible. *Burress v. City of Franklin,* 2011 U.S. Dist. LEXIS 92668 *41 (M.D. Tenn. August 17, 2011) (ECF No. 37-1) (citing *Lafata,* 325 F. App'x at 422).  Defendant would not have been prejudiced by moving Plaintiff back to night shift. In fact, it was not uncommon for Defendant to move employees from day to night.  (Grenier Dep 37:03-09).  Defendant even planned on moving Plaintiff back to night shift, and had responded positively to his request. There was an opening shortly after in a day-shift extended-coverage position.  (Wallace Dep 18:02-09).

Moreover, an ***employee is not required*** *to use the* ***"magic words"*** **accommodation** or **disability** to trigger the required interactive process, asking for continued employment can be sufficient.  *Burress,* 2011 U.S. Dist. LEXIS 92668 *41-42. (*emphasis added*).  Plaintiff may not have used the "magic words" by way of requesting his transfer back to nights, but he came very close:  Plaintiff went to Wallace and said, "I can't do this anymore.  I need to go back [to the night shift]."  (Pltf Dep 56:15-24).  He basically said he didn't want to work for Grenier. (Wallace Dep 31:10-13).  Grenier also testified he was told that Plaintiff said something to the effect he "didn't feel like he was treated fairly."  (Grenier Dep 29:18-25).  Plaintiff requested to transfer back to nights.  (*Id.* at 30:06-08).   Grenier recommended to Wallace that if Plaintiff wanted to go back to nights, let him do it, because Plaintiff was good at nights. (*Id.* at 31:13-15).

17

**4.    Plaintiff Suffered An Adverse Employment Action Pursuant To The Indirect Standard.**

There is no dispute that Plaintiff suffered an adverse employment action because he was terminated. (Pltf Dep 86:06-09). He also suffered adverse action, however, because Grenier treated him differently than other employees. On the day shift, Plaintiff was treated differently by Grenier; he was singled out. (Pltf Dep 42:02-06; 82:24-83:03; 83:07-10). For instance, Grenier sent him to talk to a driver about equipment. Plaintiff was the only one required to be outside in the heat; everyone else was allowed to work at their desks. (*Id.* at 81:18-82:02; 82:06-10). He was singled out to work in the shop and go outside to perform random activities; while the others stayed inside doing their respective jobs. (*Id.* at 82:24-83:03).

A connection exists between Plaintiff's termination and his disability. It happened within days of when Stachura told him to go to Easterday with his complaints of harassment. When Plaintiff met with Easterday, however, he was terminated before he could even start explaining the situation. (Pltf Dep 86:06-09). Easterday said, "We're done. I'm going to terminate you right now." (Easterday Dep 55:20-21).

**5.    The Employer Knew Or Had Reason To Know Of His Disability As Required For Indirect Evidence Standard.**

Wayne Wise, the Owner, and Mike Ershkin, the Corporate Representative, were aware that Plaintiff had panic disorder, because when hired, he told them he might fail the drug test because his controlled-substance medication shows up on a drug test. (Pltf Dep 50:16-25). Plaintiff's supervisors were aware that he had a panic disorder, because either he told them specifically, or they witnessed a panic attack. (Pltf Dep 37:09-13; 50:04-05; 51:16-22; 94:11-13). Jack Knuutila, a night-shift Supervisor, was aware Plaintiff was having panic attacks, because he once took Plaintiff aside and asked what was happening. Plaintiff explained, in

18

detail, and said it was just something Plaintiff had to deal with. (Pltf Dep 51:16-21). Furthermore, Plaintiff specifically told Grenier he had panic attacks when Grenier brought up that Plaintiff needed to "calm down and chill out a little bit." Plaintiff said, "I can't turn it off." (Pltf Dep 94:11-24). Thus, Defendant either knew or had reason to know of Plaintiff's disability.

**6.      Plaintiff Was Replaced As Required For Indirect Evidence Standard.**

Finally, and undisputed, Plaintiff meets the last element in an indirect evidence discrimination case: he was replaced. His replacement was Kenneth Dorsey. Dorsey was hired in July of 2012 by Wallace in the "Extended Coverage" day shift position. (Def's Resp to Pltf's Interrogatory No. 3, referenced as Exhibit 6 in the contemporaneously filed Notice of Filing).

**B.      Plaintiff's Cause Of Action Under The THRA Should Proceed as Pled.**

**1.      Discrimination**

As Defendant points out, when interpreting claims under the THRA, Tennessee courts look to the ADA. *Starks-Umoja v. Federal Express Corp.*, 341 F.Supp.2d 979, 994. Since Plaintiff has provided sufficient evidence of a connection between his adverse employment action and his disability, a general issue of material fact exists as to his cause of action under the THRA. Therefore, Plaintiff's cause of action should proceed as pled.

**2.      Malicious Harassment**

Plaintiff acknowledges that because he is not a victim of harassment due to his "race, color, ancestry, religion or national origin" per *Levy v. Franks*, 159 S.W.3d 66,81 (Tenn. Ct. App. 2004), then no genuine dispute as to any material fact related to his malicious harassment claim exists.

**C.      Sapp's Cause Of Action For Retaliation Under Tennessee Common Law**

Plaintiff meets all four elements of a cause of action for retaliation under Tennessee common law per *Turner v. Liberty National Life Ins. Co*., 488 F. Supp. 2d 672 (Mid. Dist. TN 2007). First, Plaintiff was an at-will employee. Second, Plaintiff was discharged. Third, he was discharged because he was attempting to exercise a statutory or Constitutional right when he called Stachura and asked him with whom he should speak concerning Grenier's harassment. Stachura referred Plaintiff to Easterday. (Pltf Dep 84:03-05, 07-1). When Plaintiff met with Easterday to discuss the harassment he received from Grenier, Plaintiff was not able to inform Easterday about the harassment he endured from Grenier, because he was terminated before he was allowed to discuss it. (Pltf Dep 86:06-09). He was terminated while attempting to exercise his statutory right, per the ADA, to report harassment. Finally, a substantial factor in the employer's decision to discharge him was his exercise of that right. If Plaintiff had kept "his head down" and ignored Grenier as Wallace warned him to do, he may not have been terminated. (Wallace Dep 26:25-27:02; Pltf Dep 56:10-13).

## CONCLUSION

As shown above there clearly exist genuine issues of material fact warranting denial of Defendant's Motion for Summary Judgment.

Respectfully submitted,

**ALLMAN & ASSOCIATES**

 /s/ R. Patrick Parker                    ___
Andy L. Allman, #17857
R. Patrick Parker, #16847
103 Bluegrass Commons Blvd.
Hendersonville, TN  37075
Phone: (615) 824-3761
Facsimile: (615) 264-2720

*Attorneys for Plaintiff*

20

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Plaintiff's Memorandum in Support of His Opposition to Defendant's Motion for Summary Judgment was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system on this the 11th day of December, 2014, upon:

Roland M. Lowell
Rachel Kingsbury, BPR No. 29258
7135 Centennial Place
Nashville, TN 37209
rlowell@westernexp.com
rkingsbury@westernexp.com

      /s/ R. Patrick Parker