## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| RYAN M. SAPP, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil No. 3:13-CV-0512** |
| | ) | **Judge Aleta A. Trauger** |
| WESTERN EXPRESS, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment brought by the defendant,

Western Express, Inc. ("Western" or "defendant") (Docket No. 21), to which the plaintiff, Ryan

M. Sapp ("Sapp" or "plaintiff") has filed a Response in opposition (Docket No. 26).  For reasons

discussed herein, the defendant's Motion for Summary Judgment will be granted.

## BACKGROUND

I.  **The Facts**

This dispute involves alleged discrimination against, and termination of, the plaintiff by

the defendant on the basis of a disability.[1]  Western is a company that provides trucking services.

---

[1] The facts are drawn from the defendant's Statement of Undisputed Facts and the
plaintiff's responses thereto (Docket Nos. 23, 27), the plaintiff's Statement of Disputed Material
Facts (Docket Nos. 28), as well as the exhibits filed by the parties in support of their briefs
(Docket No. 22, Exs. 1-6; Docket No. 29, Exs. 1-6).  The court is compelled to note that the
plaintiff's counsel has filed a Statement of Disputed Material Facts of questionable nature.  It is
riddled with statements of undisputed facts, factual opinions, and conclusory statements of law.
This filing has unnecessarily multiplied the work of the court.  This is not the first time that the
court has had to address these issues with the plaintiff's counsel's law firm.  *See Sales v.
InVentiv Health, Inc.*, No. 3:13-cv-0064, 2014 WL 1883936, *9 (M.D. Tenn. May 12, 2014)
(striking improper statement of undisputed material facts).  While the court will not strike the

In July 2010, Western hired Sapp for an "extended coverage" position on the night shift. (Docket No. 27 at ¶ 1; Docket No. 29-1 ("Easterday Dep.") at 27.) Sapp's night shift duties included tracking freight, answering phone calls, responding to messages, and handling other office tasks such as processing accident reports. (Easterday Dep. at 32-33.) At the time that he was hired by Western, Sapp had no work experience other than "on and off" positions at Kroger during high school and college. (Docket No. 29-5 at ¶ 5.) Sapp represented to Western that he was able to fully perform the duties of his position. (Docket No. 28 at ¶ 1; Docket No. 29-2 ("Sapp Dep.") at 47.)

Sapp allegedly suffers from an anxiety disorder that is often of moderate intensity but can sometimes be severe or result in a panic attack in stressful situations. (Docket No. 28 at ¶¶ 1-2; Sapp Dep. at 46-48.) Sapp cannot "flip [his anxiety] off like a light switch." (Sapp. Dep. at 93.) Sapp is prescribed the anti-anxiety medication clonazepam by his family practitioner.[2] (Sapp. Dep. at 8, 46; Docket No. 29-5 at ¶ 6.) Prior to his employment, Sapp verbally informed Western owner Wayne Wise, corporate representative Mike Ershkin, and supervisor Daniel Knuutila that he was being treated for an anxiety disorder and, as a result, an anti-anxiety medication would be detected in his pre-employment drug screening.[3] (Docket No. 27 at ¶ 16; Docket No. 28 at ¶ 3; Sapp. Dep. at 50.) Aside from providing this information regarding a prescription medication,

Statement of Disputed Material Facts in its entirety, it has relied upon the contents of that filing only where appropriate. Future filings by the plaintiff's counsel should be prepared with more care.

[2] Sapp represents that he is also prescribed a medication for hypertension. However, no evidentiary showing has been made that the purpose of this medication is to treat the plaintiff's alleged disability, nor has any argument been made that hypertension is a disability of the plaintiff.

[3] The plaintiff has not introduced deposition testimony from any of these individuals.

Sapp did not present medical evidence of a disability to Western prior to or during his employment.[4]

On one occasion, Sapp explained to night shift supervisor Jack Knuutilla that he was having a panic attack and that it was just something that Sapp "had to deal with." (Docket No. 27 at ¶ 16; Docket No. 28 at ¶ 5) In response to being told to calm down, Sapp told then-Vice President of Flatbed Operations Geoff Grenier ("Grenier") that he suffered from anxiety with panic attacks and that Sapp couldn't just "turn it off." (Docket No. 27 at ¶ 16; Docket No. 28 at ¶ 6; Sapp. Dep. at 93-94.) Grenier does not remember this conversation. (Docket No. 28 at ¶ 10; Docket No. 29-3 ("Grenier Dep.") at 25-28.) Sapp's direct supervisor, Matthew Wallace ("Wallace"), was not aware that Sapp alleged any disability. (Docket No. 27 at ¶ 16.)[5] There is no evidence that Sapp ever requested any accommodation on the basis of a disability related to the performance of any night shift duties.

In April 2012, Sapp requested, and was granted, a transfer to the day shift. (Docket No. 27 at ¶ 1; Docket No. 22-4 ("Easterday Aff.") at ¶ 5; Docket No. 29-4 ("Wallace Dep.") at 17-18.) The day shift position involved some additional duties, including driver management, customer interaction, checking the status of trucks in the shop, and tracking trailers, and was a promotion for good performance on the night shift. (Docket No. 28 at ¶ 11; Grenier Dep. at 38; Easterday Dep. at 35.) There is no evidence that Sapp requested any accommodation related to

---

[4] Sapp has represented to the defendant in discovery that he sees a psychiatrist. However, there is no allegation or evidence that Sapp informed Western of this fact prior to or during his employment.

[5] The defendant sets forth this undisputed fact as Statement of Undisputed Fact No. 16. The plaintiff's response discusses the purported knowledge of others, but not Wallace, and is thus non-responsive; the plaintiff has conceded this fact.

the performance of any specific duties when he was transferred to the day shift.

Sapp had performance issues on the day shift, including uncompleted assignments and falling asleep. (Easterday Aff. at ¶ 7.) Grenier spoke with Sapp multiple times about his job performance; Grenier chastised Sapp.[6] (Docket No. 28 at ¶¶ 15-16; Grenier Dep. at 21; Sapp Dep. at 36-38, 49, 56, 93.) Sapp has testified that, on one occasion, he had a panic attack when being yelled at by Grenier and that Sapp walked away. (Sapp. Dep. at 49.) Sapp has testified that, on occasion, Grenier asked Sapp why he was "nervous" or "anxious," and Sapp replied that he had anxiety. (Sapp. Dep. at 93-94.) Sapp also testified that Grenier told him, "you suck at your job." (Sapp. Dep. at 53.) On one occasion, Western Terminal Manager Alex Trent advised Sapp, "this is just the way [Grenier] is" and advised Sapp that he "just [had to] deal with it." (Docket No. 28 at ¶ 17; Sapp. Dep. at 50.) Wallace told Sapp to "keep [his] head down" and ignore Grenier. (Docket No. 28 at ¶ 21; Sapp. Dep. at 56, Wallace Dep. at 56.)

On July 13, 2012, Sapp informed Wallace, "I can't do this anymore," and requested a transfer back to the night shift. (Docket No. 27 at ¶ 5; Docket No. 28 at ¶ 22; Easterday Aff. at 10; Sapp. Dep. at 52.) Sapp said nothing more and specifically said nothing about a disability accommodation. (*See id.*; Easterday Aff. at ¶ 13). Sapp was excited to return to the night shift and believed he could perform his job well. (Docket No. 28 at ¶ 24; Easterday Aff. at 13; Sapp. Dep. at 52.) Wallace and Western Supervisor Jack Knuutila agreed to arrange Sapp's transfer to

---

[6] Sapp stated in his deposition that Grenier used obscenities and raised his voice. Grenier does not remember doing so. These differences are not material to any legal conclusion herein; the record sufficiently reflects that (1) Grenier and Sapp had conflicts, (2) Grenier was displeased with Sapp's work on the day shift, (3) Grenier criticized Sapp to his face, and (4) Sapp did not feel Grenier's treatment of him was fair. *See* Sapp Depp; Grenier Dep.; Wallace Dep.; Easterday Dep.; Easterday Aff.

the night shift within two weeks. (Docket No. 27 at ¶ 6; Easterday Aff. at ¶ 12.) Grenier

endorsed Sapp's transfer and stated his belief that Sapp was good at his night shift job. (Docket

No. 28 at ¶ 23; Grenier Dep. at 30-31.)

Around the same time, Sapp contacted Western's Chief Operations Officer Robert

Stachura ("Stachura") to voice complaints about Grenier's workplace behavior. (Docket No. 27

at ¶ 10; Docket No. 28 at ¶ 31; Easterday Aff. at ¶ 14; Sapp. Dep. at 84.) Stachura instructed

Sapp to speak with Western Executive Vice President Clarence Easterday ("Easterday").

(Docket No. 27 at ¶ 11; Easterday Aff. at ¶ 15.) Easterday arranged to meet with Sapp on July

17, 2012. (Docket No. 27 at ¶ 18; Easterday Aff. at ¶ 19.)

On July 15, 2012, Sapp failed to timely report for work on the day shift. (Docket No. 27

at ¶ 7; Easterday Aff. at ¶ 16.) Rather, Sapp reported to work at noon on that day. (Docket No.

27 at ¶ 8; Easterday Aff. at ¶ 18.) Sapp stated the belief that, despite the fact that he had been

told that his transfer to night shift would be accomplished within two weeks, he was supposed to

report to the night shift on July 15, 2012 (*i.e.*, two days after he requested the transfer). (Docket

No. 28 at ¶¶ 25-27; Sapp. Dep. at 52, 58; Easterday Aff. at ¶ 17.)

Sapp met with Easterday on July 17, 2012. (Docket No. 27 at ¶ 12; Docket No. 28 at ¶

33; Easterday Aff. at ¶ 19; Sapp. Dep. at 86.) According to his uncontradicted affidavit,

Easterday had previously been made aware of Sapp's job performance issues on the day shift,

including the failure to report to work on July 15, 2012. (Easterday Aff. at ¶¶ 7-9; Easterday

Dep. at 36.) Easterday did not initially plan to terminate Sapp. (Docket No. 28 at ¶ 38;

Easterday Aff. at ¶ 20; Easterday Dep. at 49-50.) According to Sapp, Easterday informed him

that his "performance was not up to par." (Sapp. Dep. at 86.) According to Easterday, Sapp

"launched into a tirade" and became hostile and "physically angry;" Easterday became

apprehensive that Sapp's aggression would become physical. (Easterday Dep. at 54-56; Easterday Aff. at ¶¶ 21-22.) Easterday made the decision to immediately terminate Sapp's employment; Easterday stated, "We're done. I'm going to terminate you right now." (Docket No. 27 at ¶ 13; Docket No. 28 at ¶ 34; Easterday Aff. at 23; Easterday Dep. at 55.) Easterday was unaware that Sapp claimed to have any disability until several months after Sapp's termination.[7] (Easterday Aff. at ¶ 24.)

After being terminated by Western, Sapp became employed first at Tennessee Steel Haulers and later in the brokerage field at Pearce Worldwide Logistics. (Sapp. Dep. at 23, 87.) Sapp has testified that he has never had any problems at any employment other than general problems under Grenier at Western:

> Q:    Now, while you were at [Pearce Worldwide Logistics], have you had any problems there?
> A:    It's been great. It's the best job I ever had.
> Q:    Have you asked for any special treatment there?
> A:    None at all.
> Q:    While you were at Tennessee State Haulers, didn't have any problems there?
> A:    No, I did not.
> Q:    And other than Mr. Grenier, I guess you didn't have any problems at Western; is that correct?
> A:    Not really.

(*Id.*)

## B.    The Action

---

[7] The plaintiff has not established a dispute of material fact concerning Easterday's knowledge of Sapp's problems on the day shift. Indeed, Sapp's one significant attempt to do so – via the plaintiff's Statement of Disputed Material Fact No. 37 – is a mischaracterization of Easterday's deposition testimony. Citing to several lines of Easterday's deposition, the plaintiff states that "Easterday was not aware of any issues regarding Plaintiff's employment." However, the cited passage only establishes that Easterday was not aware of any issues with Sapp's employment on the *night* shift (*i.e.*, prior to Sapp's move to the day shift). (*See* Easterday Dep. at 36.) To the contrary, Easterday's affidavit and deposition testimony establishes that Easterday was aware of Sapp's performance issues on the *day* shift prior to the July 17, 2012 meeting.

Around October 2, 2012, Sapp filed a Charge of Discrimination ("EEOC Charge") with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that Western discriminated against him on the basis of a disability. (Docket No. 22-2.) The EEOC Charge did not include an allegation of retaliation. *Id*. The EEOC Charge alleged that Sapp had an "acute disability" but provided no additional information concerning the nature of the alleged disability. *Id*. Sapp received a Right to Sue Letter from the EEOC around February 27, 2013.[8] On May 28, 2013, Sapp filed a complaint in this court against Western. (Docket No. 1.) Sapp filed an Amended Complaint on February 5, 2014. (Docket No. 13.) The Amended Complaint alleges that (1) Western failed to make reasonable accommodations for Sapp and terminated him because of his disability in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and the Tennessee Disability Act, T.C.A. § 8-50-103 ("TDA"); (2) Western (a) discriminated against Sapp because of his disability and (b) maliciously harassed Sapp, both in violation of the Tennessee Human Rights Act, T.C.A. §§ 4-21-101 *et seq.* ("THRA"); and (3) under Tennessee common law, Western retaliated against Sapp for engaging in the protected activities of requesting an accommodation for a disability and making complaints of

---

[8] The court notes that the Amended Complaint does not allege the date upon which the plaintiff received the Right to Sue Letter, making it impossible to determine from the face of the Amended Complaint whether this action was timely filed. In Plaintiff's Response to Defendant's Interrogatories dated November 26, 2013, the plaintiff stated that he received the Right to Sue Letter "on or around" February 27, 2013. (*See* Docket No. 29-5 at ¶ 10.) If the plaintiff's Right to Sue Letter was received on February 27, 2013, this action was timely filed on the 90th day thereafter. However, if it was received prior to February 27, 2013, this action may have been untimely filed. The defendant failed to raise this issue in the instant motion. The court will not *sua sponte* pursue it because the instant motion will be otherwise resolved in defendant's favor. However, the court cautions the plaintiff's counsel that describing the receipt of a key document as having occurred "on or around" a certain date is inappropriately imprecise – especially because it is a common practice of law firms to stamp all incoming mail with a specific date of receipt.

discriminatory treatment. *Id*. Western filed the instant motion on November 21, 2014. The plaintiff responded to the defendant's motion on December 11, 2014, conceding his THRA malicious harassment claim and opposing the defendant's motion as to all remaining claims.

## SUMMARY JUDGMENT ANALYSIS

### I.    Rule 56 Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II.    Employment Discrimination Standard

An employment discrimination plaintiff may prove his case by producing direct evidence that his employer, or former employer, relied upon a statutorily protected characteristic, such as a disability, as a factor in taking an employment action adverse to the plaintiff. *McDonald v. Union Camp. Corp.*, 898 F.2d 1155, 1161-62 (6th Cir. 1990). In the alternative, the plaintiff may prove a circumstantial case of disability-engendered employment discrimination by evidencing five *prima facie* components: (1) membership in the protected class of disabled persons; (2) an adverse employment action; (3) qualification for the position in controversy, with or without a reasonable accommodation by the employer of the plaintiff's impairment; (4) actual or constructive knowledge by the employer of the plaintiff's disability; and (5) either replacement by a person outside of the plaintiff's class, unjustifiable comparatively favorable treatment of a similarly-situated non-protected individual, disqualification from a job because the employer neglected to adopt a reasonable accommodation for the plaintiff's disability, or other inferential proof that the employer made an employment decision adverse to the plaintiff solely because of his or her disability. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Doren v. Battle Creek Health System*, 187 F.3d 595, 597 (6th Cir. 1999); *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997).

If the plaintiff makes such a *prima facie* showing, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Clay v. United Parcel Serv.*, 501 F.3d 695, 704 (6th Cir. 2007). To meet this burden, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for its decision. *Id.*; *see also Berry v. City of Pontiac*, 269 F. App'x 545, 549 (6th Cir. 2008). If the

defendant is successful, the burden then shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for unlawful discrimination. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). To make this showing, a plaintiff retains the ultimate burden of producing sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001).

## III.     ADA and TDA Disability Discrimination Claims

Sapp alleges that Western discriminated against him and terminated him because he was disabled, in violation of the ADA and the TDA. The ADA and TDA protect disabled employees and job applicants from discriminatory treatment. *See* 42 U.S.C. § 12112(a). Under the ADA, no covered entity shall discriminate against a qualified individual with a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. *Id.* Discrimination under the ADA includes an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual who is an applicant or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity." *Id.* at § 12112(b)(5)(A); *see also Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). Tennessee law prohibits private employers from discriminating against employees "based solely on any physical, mental, or visual handicap of the applicant, unless such handicap to some degree prevents the applicant from performing the duties required by the employment or impairs the performance of the work involved." Tenn. Code Ann. §

8–50–103(a).  A claim brought under the TDA is analyzed under the same principles as those utilized for the ADA.  C*ardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 n.2 (6th Cir. 2013) (citing *Sasser v. Quebecor Printing (USA) Corp.*, 159 S.W.3d 579, 584 (Tenn. Ct. App. 2004)); *Nance v. Goodyear Tire & Rubber, Co.*, 527 F.3d 539, 553 n.5 (6th Cir. 2008) ("Both federal and Tennessee disability discrimination actions require the same analysis."); *Sales,* 2014 WL 1883936 at *9.

Where a plaintiff seeks to establish discrimination through direct evidence, the Sixth Circuit requires the plaintiff to demonstrate that (1) he has a disability, (2) he is otherwise qualified for the job, and (3) the defendant either refused to make a reasonable accommodation for this disability or made an adverse employment decision regarding him solely because of his disability.  *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1106–07 (6th Cir. 2008); *Roush v. Weastec., Inc.*, 96 F.3d 840, 843 (6th Cir. 1996).  Where a plaintiff seeks to establish discrimination through indirect, rather than direct, evidence, the Sixth Circuit requires the plaintiff to first make a *prima facie* case, followed by the familiar *McDonnell Douglas* burden-shifting analysis.  To establish a *prima facie* case, a plaintiff must establish that (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.  *Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011); *see also Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012).  While a plaintiff is not required to show that his disability is the sole

reason for his termination, he must demonstrate that it was a but-for cause of the termination. *Lewis*, 681 F.3d at 321.

Here, Sapp attempts to establish discrimination by both direct and indirect means. Under either the direct or indirect method of proving disability-based employment discrimination, the plaintiff must prove that, at pertinent times, he suffered from a "disability" as defined by the ADA. *Doren*, 187 F.3d at 598; *Monette*, 90 F.3d at 1179. The ADA is not a general protection for medically afflicted persons. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008) (citing *Bryson v. Regis Corp.*, 498 F.3d 561, 575 (6th Cir. 2007)). Not all plaintiffs with health conditions have a "disability" within the meaning of the ADA. *Salim v. MGM Grand Detroit LLC*, 106 Fed. App'x 454, 459 (6th Cir. 2004) (quoting *Nawrot v. CPC Int'l*, 277 F.3d 896, 903 (7th Cir. 2002)).

Under the ADA, an individual is disabled if he has "(1) a physical or mental impairment that substantially limits one or more major life activities of such individual; [or] (2) a record of such an impairment; [or] (3) [been] regarded as having such an impairment ." 42 U.S.C. § 12102(1); *Morales v. BellSouth Telecom., Inc.*, No. 3:08-0032, 2009 WL 1322577, *6 (M.D. Tenn. May 11, 2009). To qualify as disabled under the first prong, a plaintiff must do more than allege a physical or mental impairment. *Verhoff v. Time Warner Cable, Inc.*, 299 Fed. App'x 488, 491–92 (6th Cir. 2008). Rather, to qualify as disabled, a physical or mental impairment must have a "substantially limit[ing]" effect on a major life activity. *Id.* An impairment meets this test if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(ii). The ADA Amendments Act of 2008, Pub.L. No. 110-325, Sept. 25, 2008, 122 Stat. 3553 ("ADAAA

Amendments"), relaxed the definition of "substantially limited" from that previously utilized by many courts and noted that this analysis does not normally require scientific analysis *vis a vis* comparators in the general population. 29 C.F.R. § 16390.2(j)(iii)-(v). Subsequent to enactment of the ADAAA Amendments, a substantial limitation need not prevent or severely restrict an individual from performing a major life activity. *Id.* However, not every impairment constitutes a disability within the meaning of the ADA – the ADAAA Amendments retained the requirement that the "substantially limits" standard demands a marked functional limitation compared to most people in the general population. *Id.* Furthermore, an impairment that only moderately or intermittently prevents an individual from performing a major life activity only substantially limits that activity if the impairment would do so when active. *Id.* at § 1630.2(j)(vii); *see also Morales*, 2009 WL 1322577 at *7.

As relevant here, "major life activities" include "working." *Id.* at 314 & n.5 (citing *Sutton v. United Air Lines*, 527 U.S. 471 (1999), *superseded on other grounds by statute as stated in Verhoff*, 299 Fed. App'x at 492). Where the "major life activity" at issue is "working," the statutory phrase "substantially limits" requires, at a minimum, that the plaintiff show that he is restricted from working in a broad class of jobs, or a broad range of jobs in various classes. *Morales*, 2009 WL 1322577 (citing *Salim*, 106 Fed. App'x at 459); *see also Swanson*, 268 F.3d at 317 (holding "substantial limitation" as to working further means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities"). The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. *See, e.g., Sutton*, 527 U.S. at 492-93; *Murphy v. United Parcel Service, Inc.*,

527 U.S. 516, 525 (1999); *Salim*, 106 Fed. App'x at 459; *Swanson*, 268 F.3d at 317.

Sapp alleges that he is disabled as a result of anxiety disorder and occasional panic attacks.[9] Sapp has adduced evidence that: (1) he takes the drug clonazepam, prescribed by his general practice physician, to treat the disorder; (2) he sees a psychiatrist; (3) he was able to work – quite successfully – on the night shift at Western; (4) stressful workplace situations or antagonistic colleagues can exacerbate his anxiety and, on occasion, trigger a panic attack, and he therefore prefers to avoid those circumstances or individuals; (5) his anxiety disorder is something he just has to "deal with;" (6) Grenier's workplace behavior caused him stress and exacerbated his alleged condition; (7) he generally did not have problems at Western aside from interactions with Grenier, and he did not want to work for Grenier; and (8) he was excited about returning to the night shift.[10] By his own admission, Sapp has had no problems in, and has requested no accommodation at, the jobs he has held after being terminated by Western.

As an initial matter, Sapp's medical claims are based entirely upon his own deposition testimony and interrogatory responses, each of which is a self-serving narrative. Plaintiff has offered no medical evidence or other probative evidence whatsoever as to his alleged medical condition. Given that the plaintiff lacks any medical proof or corroboration for these allegations,

---

[9] The Response also mentions the fact that Sapp sought treatment for alcohol problems at Cumberland Heights. *See* Resp. at 3. However, Sapp does not contend that he has a disability related to alcohol addiction.

[10] Aside from his own deposition testimony, Sapp points to several Interrogatory Responses served during the discovery phase of this litigation, in which Sapp discusses his alleged condition, lists his physicians, and identifies his prescription medication. However, Sapp makes no representation that any medical evidence aside from the name of Sapp's presecription medication was given to Western before or during Sapp's employment. Moreover, the information contained in the Interrogatory Responses lacks any real detail and is self-serving in the same manner as Sapp's deposition testimony. (*See* Docket No. 29, Exs. 5, 6.)

the court concludes that his proof cannot support a claim of disability.[11] *See Toyota Motor Mfg.,*

*LKY, Inc. v. Williams*, 534 U.S. 184, 198 ("It is insufficient for individuals attempting to prove

disability status under this test to merely submit evidence of a medical diagnosis of an

impairment."), *superseded on other grounds by statute as stated in Verhoff*, 299 Fed. App'x at

492; *Swanson*, 268 F.3d at 317 (finding vague allegations of the depressive episodes of unknown

duration and purported side effects of medication insufficient to defeat summary judgment);

*Evola v. City of Franklin*, 18 F. Supp. 3d 935, 945 (M.D. Tenn. 2014) (finding lack of evidence

from any medical professional concerning plaintiff's alleged post-traumatic stress disorder meant

the plaintiff's proof could not support a judgment on an ADA disability claim).

Sapp's evidence also fails to demonstrate any substantial limitation in his ability to work.

Indeed, Sapp's evidence does not demonstrate either (1) a general inability to work or (2) any

functional limitation as to the condition, manner, or duration in which Sapp can work. Sapp's

testimony does not establish that he is unable to perform either a class of jobs or a broad range of

jobs in various classes as compared to the average person. To the contrary, it is clear that Sapp

could – and did – successfully perform the work of a similar position at Western without

limitation.[12] Furthermore, Sapp has been gainfully employed at other companies since leaving

---

[11] In the Response, the plaintiff makes the unsupported argument that Western bears some
burden of "requesting" medical evidence. *See* Resp. at 12-13. This contention is without merit.
The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated
against the plaintiff remains at all times on the plaintiff. *See St. Mary's Honor Center v. Hicks*,
509 U.S. 502, 507 (1993). To survive summary judgment, the plaintiff bears the burden of
adducing evidence that would allow a jury to find in his favor.

[12] For this reason, Sapp also cannot establish that Western "regarded him as disabled." It
is not enough that the employer regarded an individual as somehow disabled; rather, a plaintiff
"must show that the employer regarded the individual as disabled within the meaning of the
ADA." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001). There is no evidence –
either Sapp's own testimony or the testimony of any Western employee – that Western regarded

Western without any disability-related concerns.  Even under the relaxed standard implemented

by the ADAAA, the fact that Sapp could not work one particularly stressful day shift position at

Western under Grenier's supervision does not establish a substantial limitation for purposes of

the ADA.  *See, e.g., Salim*, 106 Fed. App'x at 460 (finding, where a diabetic casino dealer could

not perform a dealer job during a particular shift but could perform the job otherwise, that "a

schedule-specific job restriction is not sufficient to qualify as a substantial impairment of the

plaintiff's ability to work"); *Cotter v. Ajilon Services, Inc.*, 287 F.3d 593, 598 (6th Cir. 2002)

(rejecting argument that doctor's order that the plaintiff needed to avoid stress in the workplace

demonstrated a substantial impairment of the plaintiff's ability to work), *abrogated on other*

*grounds by Lewis*, 681 F.3d at 312; *Minnix v. City of Chillicothe*, 205 F.3d 1341 (table), 2000

WL 191828, *5-*6 (6th Cir. Feb. 10, 2000) (finding that plaintiff failed to establish a genuine

dispute of material fact as to substantial limitation of ability to work, where the plaintiff testified

that he was able to work in other positions but could not work in a particular position that would

---

Sapp as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes." 29 C.F.R. § 1630.2(j)(3)(I); *Starks-Umoja v. Federal Express Corp.*, 341 F. Supp. 2d 979, 993-94 (W.D. Tenn. 2003).  The evidence establishes that Western promoted Sapp to the day shift based upon his good performance on the night shift – and did so without any mention of disability or accommodation.  Furthermore, there is no evidence that Wallace (Sapp's night shift supervisor) or Easterday (the executive who decided to terminate Sapp) were ever aware of Sapp's alleged anxiety disorder.  At most, the evidence here shows that (1) certain Western executives knew Sapp took medication for an anxiety disorder and was especially troubled by stressful situations, (2) Grenier on occasion asked Sapp why he was jittery, wound up or nervous, and (3) Western executives agreed to return Sapp to the night shift after his conflicts with Grenier (rather than terminate Sapp for any perceived disability).  This is insufficient to create a genuine dispute of material fact as to whether Western regarded Sapp as disabled.  *See, e.g., Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (holding that an employer does not necessarily regard an employee as disabled "simply by finding the employee to be incapable of satisfying the singular demands of a particular job") (quotation marks and citation omitted).

expose him to diesel fumes).[13]

Accordingly, Sapp has not established a genuine issue of material fact as to whether his major life activity of working is substantially limited by his alleged anxiety disorder, as compared with an average person in the general population. Western is therefore entitled to judgment as a matter of law on Sapp's ADA and TDA disability discrimination claims.[14]

## IV.     **Tennessee Human Rights Act Claim**

The Complaint alleges disability discrimination under the THRA. However, there is no separate claim of disability discrimination under the THRA. *Whited v. Community Bank of the Cumberlands, Inc.*, No. 2-08-0061, 2010 WL 605280, *8 (M.D. Tenn. Feb. 18, 2010). Instead, the TDA, Tenn. Code Ann. § 8–50–103 (2008), provides a claim for discrimination on the basis of "disability," as defined under the THRA, Tenn. Code Ann. § 4–21–102(3)(A) (2008). *Id.* (citing *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000), *abrogated on other grounds by Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777 (Tenn. 2010)). "The [TDA] works in conjunction with the THRA to grant an individual a civil cause of action for wrongful discrimination based upon a [disability]." *Perlberg v. Brencor Asset Mgmt.*, 63 S.W.3d 390, 394 (Tenn. Ct. App. 2001). Thus, disability claims alleged under the THRA have been treated as being alleged under the TDA. *Id.*; *see also Adams v. TRW Automotives U.S. LLC*, No.

---

[13] In the Response, Sapp appears to suggest in passing that his anxiety disorder substantially limits a major life activity other than work. See Resp. at 13. This effort merely consists of the plaintiff listing numerous major life activities (*e.g.*, concentrating, thinking, communicating, interacting with others). *Id.* However, Sapp makes no effort to explain how his condition actually substantially limits any of these activities. Rather, the only specific explanation offered by Sapp is related to the major life activity of working. *Id.* at 13-14.

[14] Because Sapp's inability to establish a disability is fatal to both direct and indirect disability discrimination claims, the court need not proceed to subsequent steps in the discrimination analysis (*e.g.*, request for accommodation, adverse employment decision).

3:03–1240, 2005 WL 1862302, *18 (M.D. Tenn. July 22, 2005) (citing *Dunn v. Sharp Mfg. Co. of America*, No. 01–2679 MA/V, 2003 WL 1793038, *3 (W.D. Tenn. Jan.10, 2003) (although plaintiff alleged a disability discrimination claim under the THRA, the court deemed the claim to have been asserted under the TDA)).

As discussed *supra*, Tennessee courts look to federal law for guidance in analyzing disability discrimination claims. *Barnes*, 48 S.W.3d at 705; *Nance*, 527 F.3d at 553 n.5; *Starks-Umoja*, 341 F. Supp. 2d at 996. For this reason, Sapp concedes that the outcome of his ADA and TDA claims should dictate the outcome of his THRA claim. *See* Resp. at 19. Because the court has granted summary judgment in favor of Western on Plaintiff's other disability discrimination claims based on failure to establish a disability, the court will also grant Western's motion for summary judgment on Sapp's Tennessee Human Rights Act claim. *See Starks-Umoja*, 341 F. Supp. 2d at 996.

## V.      **Tennessee Common Law Retaliation Claim**

The Tennessee Supreme Court has articulated four elements that an employee who has been terminated must show to make out the common law tort of retaliatory discharge: (1) that an employment-at-will relationship existed; (2) that the employee was discharged; (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy. *Yates v. Hertz Corp.*, 285 F. Supp. 2d 1104, 1110-11 (M.D. Tenn. 2003); *Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 862 (Tenn. 2002); *Mason v.*

*Seaton*, 942 S.W.2d 470, 474 (Tenn. 1997); *Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 444-45 (Tenn.1984).

Tennessee law has long endorsed the employment-at-will doctrine, which provides for employers or employees to terminate their relationship without breach of contract given "good cause, bad cause, or no cause." *Crews*, 78 S.W.3d at 857; *see also Clanton*, 677 S.W.2d at 443; *Payne v. Western & Atl. R.R.*, 81 Tenn. 507, 519-20 (Tenn. 1884), *overruled in part on other grounds by Hutton v. Watters*, 179 S.W. 134, 138 (Tenn. 1915). The policies behind the at-will doctrine are that employers should be free to make business judgments without interference from the courts, *see Mason*, 942 S.W.2d at 474, and employees should be able to quit working for a person or company and be able to exercise their rights just as employers may. *See Crews*, 78 S.W.3d at 858 (citing *Payne*, 81 Tenn. at 518-19). Despite a general adherence to the at-will employment doctrine, the Tennessee legislature and courts have carved out some restrictions on the right of an employer to terminate an employee, usually for reasons of well-defined public policy. *Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 555 (Tenn. 1988). As discussed *supra*, there are statutory restrictions on the employer's right to terminate an employee for discriminatory reasons based on disability. Tenn. Code Ann. § 8-50-103; *Chism*, 762 S.W.2d at 555.

The Tennessee Supreme Court has framed the cause of action for retaliatory discharge as recognizing that, "in limited circumstances, certain well-defined unambiguous principles of public policy confer upon employees implicit rights which must not be circumscribed or chilled by the potential of termination." *Yates*, 285 F. Supp. 2d at 1111 (quoting *Stein v. Davidson Hotel*

*Co.*, 945 S.W.2d 714, 717 (Tenn. 1997)). The court has cautioned that the exceptions to the employment-at-will doctrine should be "narrowly applied" and not permitted to consume or eliminate the general rule. *Id.*; *see also Chism*, 762 S.W.2d at 556.

Regarding the plaintiff's *prima facie* case, there is no dispute between the parties as to the first two elements of the common law claim for retaliatory discharge. Both Sapp and Western agree that there was an at-will employment relationship between them at the time of Sapp's termination. The parties also agree that Sapp was discharged on July 17, 2012. The key dispute between the parties relates to the third element of the cause of action: whether or not the reason for the discharge was that Sapp attempted to exercise a statutory or constitutional right, or for any other reason that violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision. *Yates*, 285 F. Supp. 2d at 1111*; Crews*, 78 S.W.3d at 862.

The Amended Complaint alleges that Sapp's discharge was retaliation for "requests of an accommodation" and "complaints of discriminatory treatment" under the ADA. In response to the instant motion, Sapp more specifically identifies the complaints to be those he made about Grenier's "harassment." Sapp relies upon the evidence that he was terminated by Easterday before he had the opportunity to discuss Grenier's behavior. Western contends that no reasonable jury could conclude that Sapp was terminated out of retaliation for requesting an accommodation or complaining about Grenier.

The court has concluded that Sapp was not disabled or regarded as disabled under the ADA or TDA. As a result, Sapp had no statutory or public policy basis for requesting an accommodation. Even if the court were to assume that Sapp's request for a transfer back to the night shift was a proper request for accommodation under the ADA or TDA, the undisputed facts

establish that said request was granted – not denied – by Western.  Western executives (including Grenier) agreed to the shift change and stated they would implement it within two weeks.  In short, Sapp's naked request for a shift change cannot support a claim of retaliatory discharge.

Because he was not disabled under the ADA or TDA, Sapp also had no statutory or public policy basis for his complaints about Grenier.  Moreover, Sapp has adduced no evidence that any Western employee was displeased with Sapp due to Sapp's problems with Grenier.  Indeed, the record supports the conclusion that other Western employees understood Sapp's concerns – *i.e.*, they were aware that Grenier was a difficult supervisor who treated Sapp harshly.  Finally, it is undisputed that Easterday (1) made the decision to terminate Sapp alone, (2) had not decided to terminate Sapp prior to the July 17, 2012 meeting, even with input received from other Western executives, and (3) decided to terminate Sapp during the July 17, 2012 meeting *before* Sapp had complained to him about Grenier.  There is no evidence upon which a reasonable jury could decide that Easterday, who had not intended to terminate Sapp despite knowledge of Sapp's unhappiness with Grenier, changed his mind on the spur of the moment and retaliated against Sapp before Grenier even arose in conversation.

Accordingly, Western is entitled to judgment as a matter of law on the plaintiff's common law retaliatory discharge claim.

## **CONCLUSION**

For these reasons, the defendant's Motion for Summary Judgment (Docket No. 21) will

be granted.  An appropriate order will enter.

                                              _____

                                                ALETA A. TRAUGER
                                        United States District Judge